AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

In the Matter of the Use of
*(Briefly describe the property to be searched or identify the person by name and address)*
1) Residence 10216 12th Ave SW, Seattle, WA;
2) Vehicle 2017 Acura TL, WA Plate BNR6222
3) Person of Vinh Q. Nguyen

Case No.  MJ19-136

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

1) Residence 10216 12th Ave SW, Seattle, WA; 2) Vehicle 2017 Acura TL, WA Plate BNR6222; and, 3) Person of Vinh Q. Nguyen, as further described in Attachment A.

located in the ___Western___ District of ___Washington___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Section 922 | Felon in Possession of Firearm and Possession of Firearm in Furtherance of Drug Trafficking Crime |
| Title 21, U.S.C., Section 841 and 846 | Possession of a Controlled Substance with Intent to Distribute |

The application is based on these facts:
✓ See Affidavit of Lexie Widmer continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means ☐ telephonically recorded.

*Applicant's signature*

Lexie Widmer, Special Agent ATF
*Printed name and title*

☐ The foregoing affidavit was sworn to before me and signed in my presence, or
☉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 04/03/2019

*Judge's signature*

City and state: Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

USAO: 2019R00277

Attachment A

Locations and Person to be Searched

1) Residence 10216 12th Ave SW, Seattle, Washington, is a single-family residence with white trim and attached garage. The numbers 10216 are emblazoned on the trim above the garage;

2) Vehicle 2017 Acura TL, WA Plate BNR6222;

3) Person of Vinh Quang Nguyen, an Asian male with DOB: XX/XX/1985, SOC: XXX-XX-9493, FBI:75748CC5, and depicted in photographs association with Washington Driver's License XXXXXVQ15 including, but not limited to, the named person's clothing and that person's carried items and containers, such as wallets, cases, backpacks, and/or bags.

# Attachment B

## List of Items to be Searched for and Seized

This warrant authorizes the government to search for and seize the following items:

Evidence and/or fruits of the commission of the following crimes: Felon in Possession of a Firearm and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 922, and Possession of a Controlled Substance with Intent to Distribute, in violation of Title 21, United States Code, Sections 841 and 846, together with related offenses, as follows:

1. **Controlled Substances**: Including but not limited to cocaine, cocaine base in the form of crack cocaine, heroin, oxycodone and/or other diverted prescription drugs, and methamphetamine.

2. **Drug Paraphernalia**: Items used, or to be used, to store, process, package, use, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, tape, hockey or duffel bags, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

3. **Drug Transaction Records**: Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances, including such records stored in electronic format.

4. **Customer and Supplier Information**: Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items, including such records stored in electronic format.

5. **Cash and Financial Records**: Currency and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, including such records stored in electronic format; and money counters.

6. **Photographs/Surveillance**: Photographs, video tapes, digital cameras, surveillance cameras, and associated hardware/storage devices, and similar items, depicting property occupants, friends and relatives of the property occupants, or

**Attachment B**

List of Items to be Searched for and Seized

suspected buyers or sellers of controlled substances, controlled substances or other contraband, weapons, and assets derived from the distribution of controlled substances, including such records stored in electronic format.

      7.      **Weapons**: Firearms, magazines, ammunition, and body armor, and other weapons-related items such as holsters and equipment to clean firearms.

      8.      **Codes**: Evidence of codes used in the distribution of controlled substances, including but not limited to passwords, code books, cypher or decryption keys, and similar information.

      9.      **Property Records**: Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the purchase, ownership, rental, income, expenses, or control of the premises, and similar records of other property owned or rented.

      10.      **Indicia of occupancy**, residency, and/or ownership of assets including, but not limited to, utility and telephone bills, canceled envelopes, rental records or payment receipts, leases, mortgage statements, and other documents.

      11.      **Evidence of Storage Unit Rental or Access**: rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords, or other documents relating to storage units.

      12.      **Evidence of Personal Property Ownership**: Registration information, ownership documents, or other evidence of ownership of personal property including, but not limited to, vehicles, vessels, boats, airplanes, jet skis, all-terrain vehicles, RVs, and other personal property; evidence of international or domestic travel, hotel/motel stays; and any other evidence of unexplained wealth.

      13.      **Individual and business financial books**, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, such as:

      a.      Employment records: paychecks or stubs, lists and accounts of employee payrolls, records of employment tax withholdings and contributions, dividends, stock certificates, and compensation to officers.

      b.      Savings accounts: statements, ledger cards, deposit tickets, register records, wire transfer records, correspondence, and withdrawal slips.

      c.      Checking accounts: statements, canceled checks, deposit tickets, credit/debit documents, wire transfer documents, correspondence, and register records.

**Attachment B**

List of Items to be Searched for and Seized

        d.      Loan Accounts:  financial statements and loan applications for all loans applied for, notes, loan repayment records, and mortgage loan records.

        e.      Collection accounts:  statements and other records.

        f.      Certificates of deposit:  applications, purchase documents, and statements of accounts.

        g.      Credit card accounts:  credit cards, monthly statements, and receipts of use.

        h.      Receipts and records related to gambling wins and losses, or any other contest winnings.

        i.      Insurance:  policies, statements, bills, and claim-related documents.

        j.      Financial records:  profit and loss statements, financial statements, receipts, balance sheets, accounting work papers, any receipts showing purchases made, both business and personal, receipts showing charitable contributions, and income and expense ledgers.

14.     All bearer bonds, letters of credit, money drafts, money orders, cashier's checks, travelers checks, Treasury checks, bank checks, passbooks, bank drafts, money wrappers, stored value cards, and other forms of financial remuneration evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or expenditures of money.

15.     All Western Union and/or Money Gram documents and other documents evidencing domestic or international wire transfers, money orders, official checks, cashier's checks, or other negotiable interests that can be purchased with cash. These documents are to include applications, payment records, money orders, frequent customer cards, etc.

16.     Negotiable instruments, jewelry, precious metals, financial instruments, and other negotiable instruments.

17.     Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency.

18.     Correspondence, papers, records, and any other items showing employment or lack of employment.

19.     Telephone books, and/or address books, facsimile machines to include the other memory system, any papers reflecting names, addresses, telephone numbers, pager numbers, cellular telephone numbers, facsimile, and/or telex numbers, telephone records and bills relating to co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists. Also, telephone answering devices that record telephone conversations and the tapes therein for

**Attachment B**

List of Items to be Searched for and Seized

messages left for or by co-conspirators for the delivery or purchase of controlled substances or laundering of drug proceeds.

20. Safes and locked storage containers, and the contents thereof that are otherwise described in this document.

21. Tools: Tools that may be used to open hidden compartments in vehicles, paint, bonding agents, magnets, or other items that may be used to open/close or conceal said compartments.

22. Cell Phones: Cellular telephones and other communications devices including smartphones (i.e., iPhones, Android phones, Blackberries, and the like) may be seized, and searched for the following items:
   a. Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);
   b. Stored list of recent received, sent, and missed calls;
   c. Stored contact information;
   d. Stored photographs of narcotics, currency, firearms, or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs;
   e. Stored photographs of real estate, or other records pertaining to the purchase, sale, lease, or renovation of real property including any embedded GPS data associated with those photographs;
   f. Stored text messages, as well as any messages in any internet messaging apps, including but not limited to Facebook Messenger, iMessage, Wikr, Telegram, Signal, WhatsApp, and similar messaging applications.

# AFFIDAVIT

STATE OF WASHINGTON   )
                      )
COUNTY OF KING        )

I, Lexie Widmer, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), having been duly sworn, state as follows:

## I. INTRODUCTION

1. I, Lexie Widmer, together with other agents of the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), am currently investigating VINH Q. NGUYEN for firearms and narcotics violations. This application seeks permission to search NGUYEN's home-including the grounds and outbuildings, his person, and his vehicle for controlled substances, firearms, firearms parts, and related evidence of the crimes of Felon in Possession of a Firearm and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 922, and Possession of a Controlled Substance with Intent to Distribute, in violation of Title 21, United States Code, Sections 841 and 846.

## II. AGENT BACKGROUND

2. I am a special agent (SA) duly sworn and employed by the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I am currently assigned to the Seattle V ATF Field Office, located within the Seattle, Washington, Field Division. I have been employed as a special agent since July 2017.

3. I am a graduate of Western Oregon University in Monmouth, Oregon, where I received a Bachelor of Science in Computer Science and a Bachelor of Science in Criminal Justice. I completed a twelve-week Criminal Investigator Training Program (CITP) and a fifteen-week Special Agent Basic Training (SABT) at the ATF National Academy/Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.

4. I am responsible for investigations involving specified unlawful activities, to include violent crimes involving firearms that occur in the Western District of

Washington. I am also responsible for enforcing federal firearms and explosives laws and related statutes in the Western District of Washington. I received training on the proper investigative techniques for these violations, including the identification of firearms and location of the firearms' manufacture. I have actively participated in investigations of criminal activity, including but not limited to: crimes against property, narcotics-related crimes, and crimes involving the possession, use, theft, or transfer of firearms. During these investigations, I have also participated in the execution of search warrants and the seizure of evidence indicating the commission of criminal violations.

5. The facts in this affidavit and in the attached document are based on my training and experience, and information obtained from other agents, detectives, analysists, and witnesses. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware that relate to this investigation.

### III.  LOCATIONS TO BE SEARCHED

6. This affidavit is submitted in support of an application to search the following property and vehicle collectively referred to as the "Subject Premises," and the person of VINH NGUYEN, all as more fully described in Attachment A hereto, incorporated by reference. As set forth herein, there is probable cause to believe each location contains evidence of the aforementioned offenses. The evidence to be searched for and seized is more particularly described in Attachment B hereto, incorporated by this reference.

   a. A single family residence located at 10216 12th Avenue SW, Seattle, Washington, 98146, (the "Subject Premises") and its surrounding property, grounds, and outbuildings.

   b. A 2017 Acura TL bearing Washington license plate number BNR6222.

   c. The person of VINH NGUYEN.

Affidavit SA Widmer - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV. INFORMATION ABOUT THE CONFIDENTIAL INFORMANT

7. For the purposes of this search warrant, it should be assumed the Confidential Informant (CI) has four felony convictions and is assisting law enforcement in exchange for consideration towards his/her own possible pending charges in King County Superior Court.

## V. STATEMENT OF PROBABLE CAUSE

8. On March 22, 2019, ATF TFO Wade Jones, ATF SA Gregory Heller, and I met with an individual who was eventually registered as an ATF Confidential Informant (CI). The CI gave me information about VINH Q. NGUYEN.

9. The CI said an Asian male known to him/her as "Vinny" was a drug dealer that sold approximately ten ounces of heroin per day. The CI believed Vinny had served prison time previously.

10. The CI said Vinny had multiple people who sold narcotics on his behalf. The CI said he/she typically received about an ounce of heroin from Vinny each week. He/she said Vinny typically met with him/her in parking lots and transferred the heroin while they sat in vehicles.

11. The CI said he/she had seen Vinny in possession of firearms, including a Beretta pistol and a Glock pistol. The CI said the Glock pistol had been modified by adding a square to the back of the slide. The CI said this modification allowed the Glock pistol to function as a machinegun. The CI said Vinny not only possessed firearms, but was also willing to sell them.

12. According to the CI, Vinny drove a gold or tan 2004-2007 Acura TL sedan with dark window tint. The CI said Vinny also drove a white Lexus car. The CI said he/she did not know where Vinny lived, except he/she knew Vinny had recently moved to the West Seattle neighborhood. The CI provided phone number 253-785-1207 for Vinny. TFO Jones verified that number was stored in the CI's phone under a contact name that included "Vinny."

13. TFO Jones showed the CI a known booking photograph of VINH NUGYEN and the CI confirmed NGUYEN was the person he/she knew as "Vinny."

14. I examined NGUYEN's National Crime Information Center (NCIC) Criminal History. I saw NGUYEN had the following felony convictions:

- 2016 U.S. District Court of Western Washington-Possession of Ammunition by a Convicted Felon and Possession of Controlled Substances with Intent to Distribute;[1]
- 2016 King County Superior Court-Assault 3rd Degree;
- 2014 King County Superior Court-Possession of a Controlled Substance;
- 2012 King County Superior Court-Intimidating a Witness;
- 2006 King County Superior Court-Violation of Uniform Controlled Substance Act (Attempt);

15. I also examined NGUYEN's NCIC Wanted Person record. I saw NGUYEN had two active warrants for his arrest. One warrant was for violation of NGUYEN's Washington Department of Corrections (DOC) supervision and the other was for violation of his federal supervised release.

16. On March 27, 2019, TFO Jones obtained a King County Superior court order for the real-time device location associated with NGUYEN's phone, 253-785-1207.

17. Using the GPS locations of NGUYEN's phone resulting from the warrant, TFO Jones identified the subject premises, 10216 12th Avenue Southwest, Seattle, WA, as a potential address for NGUYEN, as NGUYEN's phone pinged at that location multiple times. I saw this address was in the area commonly known as West Seattle, which was consistent with the CI's information.

18. On March 29, 2019, using the GPS locations of NGUYEN's phone resulting from the warrant, ATF SAs began surveillance on NGUYEN around 2:00PM.

---

[1] Of note, NGUYEN remains under supervised release on this conviction, under Case No. CR15-120JCC.

Having previously viewed NGUYEN's driver's license photo, SAs identified NGUYEN as the driver of a gold Acura bearing Washington license plate BNR6222 (the vehicle that is the subject of this warrant application).

19. During their surveillance, ATF SAs observed NGUYEN as he made short stops to various locations in the area of 16th Avenue Southwest and Southwest 106th Street in Seattle, WA.

20. At one point, SAs saw NGUYEN park in a restaurant parking lot, where he got out of his vehicle and made contact with an unknown Asian male. SA Catherine Cole observed NGUYEN return to the driver's seat of his gold Acura, close the door, and roll the window up (which was initially down). SA Cole observed the unknown male enter the front passenger seat of the gold Acura, and close the door. Approximately eight minutes later, SA Cole observed the unknown male exit the vehicle. These interactions are consistent with drug transactions, based on my training and experience.

21. Shortly after this activity, I observed the gold Acura pull into the driveway of the subject premises, a residence located at 10216 12th Avenue Southwest, Washington. I also observed a white Lexus sedan bearing Washington plate BLB7499 parked in front of this residence. SAs stopped surveillance around 3:30PM.

22. Later on March 29, 2019, around 11:05PM, ATF TFO Clay Agate observed the gold Acura and white Lexus still parked at 10216 12th Avenue Southwest.

23. I obtained the WA DOL record for the gold Acura bearing Washington plate BNR6222. I saw this vehicle was registered Peter Dinh, 7602 40th Avenue South, Apartment 201, Seattle, WA. I obtained the WA DOL record for the white Lexus bearing Washington plate BLB7499. I saw this vehicle was also registered to Peter Dinh, 7602 40th Avenue South, Apartment 201, Seattle, WA.

24. TFO Jones saw that on March 30, 2019, around 9:28PM, the location data for NGUYEN's phone stopped transmitting. Based on the accumulated data set of locations for NGUYEN's phone, TFO Jones saw the subject premises, 10216 12th Avenue Southwest was a likely residence for NGUYEN.

25. On April 1, 2019, I was informed the last address reported to WA DOC for NGUYEN was 7602 40th Avenue South, Apartment 201, Seattle, WA. When DOC last visited this residence in November 2018, they were told NGUYEN had not been there for the past week.

26. Also on April 1, 2019, ATF SAs and TFOs conducted surveillance of the subject premises at 10216 12th Avenue Southwest. When SA Gregory Heller arrived at approximately 1:00PM, he saw the gold Acura TL with license plate BNR6222 was parked in the driveway with the driver's door open. He saw NGUYEN and two females working on a light blue Toyota Scion that was parked at the end of the driveway. SA Heller saw that NGUYEN and the females were working on and removing the interior door panels of the driver and passenger doors. During some of this process, SA Heller saw that NGUYEN was wearing clear plastic gloves of the type commonly seen in medical or food preparation scenarios. SA Heller eventually saw one of the females carrying one of the removed door panels towards the house.

27. Later, TFO John Conaty saw a female bring interior car door panels from the residence to the blue Scion. She put them in the back seat of the vehicle and drove away.

28. I know, based on my training and experience, that drug traffickers will hide controlled substances in the voids of vehicles, including within the door panels of vehicles.

29. SA Heller and other SAs and TFOs watched the subject residence for approximately five hours. They noted a high level of activity by a large number of different individuals who were associated with various different vehicles. The SAs and TFOs only saw NGUYEN leave once in his gold Acura TL. He was gone for approximately 45 minutes. After NGUYEN returned, SAs and TFOs watched numerous individuals arrive at the residence, stay for short periods of time, and leave again. These types of short-stay interactions are indicative of drug trafficking and/or trafficking in

other contraband such as firearms. The following is a summary of the activity of those with short stays at the residence:

     a. A black Escalade arrived in the driveway. An occupant exited, went to the residence, quickly returned to the Escalade and the Escalade drove away. All of this happened within three minutes.

     b. A small silver Mazda SUV parked on the street near the residence. A female exited the SUV and went to the house. She exited the house, returned to the SUV, and left approximately thirteen minutes later.

     c. A maroon sedan arrived and parked near the residence. A male exited the car and went to the front door. He was let inside by a male in a white shirt (NGUYEN had been wearing a white shirt when SA Heller saw him.) The male from the maroon car was inside the residence for four minutes before he exited. When he exited, he was carrying a pillowcase or cloth bag and a shopping bag. He did not have either of these items when he entered. The male returned to the maroon car and left.

     d. A gray Mercedes arrived, and the driver went inside the house carrying a small bag. Five minutes later the driver exited the residence without a bag. He returned to the Mercedes and left.

     e. Later, the same maroon sedan mentioned above returned to the residence and parked in the street. Within two minutes of its arrival, a female exited the residence and handed a white bag to an occupant of the car. The maroon car then immediately left the area.

     f. A burgundy Acura parked in the driveway. A male knocked on the front door. He was eventually let into the residence by a female. After being inside for only one minute, he exited and returned to his vehicle. He left the area immediately.

     g. A silver Mercedes pulled into the driveway. A female passenger exited the vehicle and went to the house. She returned one minute later and stood by the

vehicle. After four more minutes, the female closed the overhead garage door, got back in the Mercedes and it left.

## VI. COMMON CHARACTERISTICS OF DRUG TRAFFICKERS

30. As a result of my training and experience, and based on my consultation with other agents and law enforcement officers, I have an understanding of the manner in which narcotics are distributed and the various roles played by individuals and groups in their distribution. I have encountered and have become familiar with various tools, methods, trends, paraphernalia, and related articles utilized by various traffickers in their efforts to import, conceal, and distribute controlled substances. I am also familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations. I am also familiar with the manner in which drug traffickers will use weapons to protect their drug activities and further its goals.

31. Based upon my training, experience, and conversations with other experienced officers and agents, I know that:

a. When substantial amounts of narcotics or other contraband are transported in vehicles, suspects commonly conceal the contraband in areas not typically used for storage, such as in voids behind interior panels. This is done to attempt to avoid detection by border inspectors or law enforcement officers who might search the vehicle.

b. Drug dealers typically make a profit by purchasing a bulk amount of narcotics. The dealer can then sell smaller amounts of narcotics for a higher per unit price than the per unit price of their bulk purchase. For this strategy to be successful, the dealer typically needs a large customer base and must make frequent sales. Since during a narcotics transaction the dealer and the customer are in an exposed position (with their money or narcotics readily accessible) both parties are susceptible to theft, robbery, or law enforcement detection. As a result, the transactions themselves are usually kept brief. A pattern of numerous people entering a residence, staying for a matter of minutes, and leaving is consistent with a drug dealer conducting business.

c. It is common for drug and weapons dealers to use cellular phones subscribed to in a name other than their own. It is also common for drug dealers to use "pre-paid" cellular phones for which no real subscriber information is available.

d. During the execution of search warrants at the residences of drug dealers, it is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of vehicles, residences, and/or storage units.

e. It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their vehicles, residences, and/or storage units for their ready access and to conceal these items from law enforcement authorities.

f. Narcotics traffickers often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.

g. Narcotics traffickers sometimes "front," that is, provide on consignment, controlled substances to their clients. These books, records, receipts, notes, ledgers, commonly known as "pay and owe sheets," are maintained where the traffickers have ready access to them.

h. Traffickers of controlled substances commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their clients, sources, and associates in drug trafficking.

i. Persons involved in drug trafficking conceal in their residences caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in narcotics trafficking activities.

j. Drug traffickers amass large proceeds from the sale of drugs and that they attempt to legitimize these profits. To accomplish these goals, drug traffickers

utilize domestic banks and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, letter of credit, brokerage houses, real estate, shell operations, and business fronts. Persons involved in drug trafficking and or money laundering keep papers relating to these activities for future reference.

  k. Since the Government's efforts at seizing and forfeiting drug related assets have been widely publicized in the news media and by word of mouth, I know that drug traffickers often place assets in names other than their own to avoid detection of these assets by government agencies. Even though these assets are in other person's names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

  l. Court decisions have recognized, that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

  m. Evidence relating to ownership and interest in real property is often located at the residences, businesses, and banks of traffickers.

  n. Drug traffickers take, or cause to be taken, photographs of themselves, their associates, their property, and their product. These traffickers usually maintain these photographs in their possession.

  o. Narcotic traffickers who distribute controlled substances must maintain on hand amounts of U.S. currency in order to maintain and finance their on-going narcotics business. Traffickers commonly deal in currency because of its untraceable nature, and also convert their illicit currency into currency equivalents such as cashier's checks and money orders.

  p. Traffickers utilize cell phones, smart phones, Blackberry devices, text messages and/or email devices for ready access to their clientele for the purpose of maintaining their drug-related business, and to store customer and supplier names and contact information.

q. Persons trafficking and using controlled substances commonly sell or use more than one type of controlled substance at any one time.

r. It is common for drug dealers to also be users of their product, and it is common for the drug user to keep paraphernalia, such as syringes, pipes, spoons, containers, straws, razor blades, and other items which are associated with the use of controlled substances, as well as paraphernalia associated with the manufacture and sale of controlled substances, such as scales, sifters, containers, cutting agents, packaging materials, and other items associated with the manufacturing, processing, and distribution of controlled substances in their vehicles, residences, and/or storage units.

s. Drug traffickers commonly have in their possession, on their person, and at their residences, and/or in their vehicles and storage units, firearms and other weapons which are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to, controlled substances, paraphernalia for the use or sale of controlled substances, books, records, jewelry, and U.S. currency.

t. Evidence of drug trafficking, such as the items described above, is likely to be found where the drug dealers reside, in their vehicles, and in their storage units, despite the lack of direct evidence of criminal activity at the residence or the passage of several months since the last reported activity.

u. I know that marijuana, heroin, and methamphetamine are controlled substances. In my experience and the experience of the law enforcement agents with whom I associate, the illegal distribution of controlled substances is frequently a continuing activity over months and years.

v. Persons involved in the trafficking of controlled substances typically will obtain and distribute drugs on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory," which will fluctuate in size depending upon the demand for and the available supply of the product.

1   　　　w.   Drug traffickers keep records of their illegal activities also for a
2   period of time extending beyond the time during which the trafficker actually
3   possesses/controls illegal controlled substances, in order to maintain contact with
4   criminal associates for future transactions and so that the trafficker can have records of
5   prior transactions for which the trafficker might still be owed money or might owe
6   someone else money.
7   　　　x.   The aforementioned items are often maintained by the drug
8   trafficker in secure locations within the premises under their dominion and control, in
9   their vehicles, storage units, residences, and/or on their person, not only for ready access,
10  but also to prevent them from being stolen by other drug dealers and to conceal them
11  from law enforcement.  These items are often concealed on property in/and around the
12  trafficker's residences, in order to conceal the illicit items from law enforcement, should
13  a search by law enforcement at the location occur.
14  / / /
15  / / /
16  / / /
17  / / /
18  / / /
19  / / /
20  / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

## VII. CONCLUSION

32. Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence of the crimes of Felon in Possession of a Firearm, Possession of a Controlled Substance with Intent to Distribute, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, as more particularly described in Attachment B hereto, can be found at the Subject Premises and in the vehicle of and on the person of VINH Q. NGUYEN, as more particularly described in Attachment A hereto.

_____
LEXIE WIDMER
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the 3rd day of April, 2019.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge